ORIGINAL

Approved: _Brooke E. Cucinella / Jeannette Vag_
Brooke E. Cucinella/Jeannette A. Vargas
Assistant United States Attorneys

Before:     THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

DOC #____1____

JUN 0 9 2015

S. D. OF N.Y.

15 MAG 1982

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :    **SEALED COMPLAINT**
                                      :
     - v. -                           :    Violation of
                                      :    18 U.S.C. §§ 242, 371,
BRIAN COLL and                        :    1512(b)(3), 1512(k),
BYRON TAYLOR,                         :    1519, 1503(a) and 2
                                      :
                  Defendants.         :
                                      :    COUNTY OF OFFENSE:
                                      :    BRONX
- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          VANESSA M. TIBBITS, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

### COUNT ONE
(Deprivation of Rights Under Color of Law - COLL)

          1.    On or about December 19, 2012, in the Southern
District of New York, BRIAN COLL, the defendant, under color of a
law, statute, ordinance, regulation, and custom, willfully subjected
a person in a State, to wit, the State of New York, to the deprivation
of a right, privilege, and immunity secured and protected by the
Constitution and laws of the United States, to wit, the right to be
free from excessive use of force, which deprivation resulted in
bodily injury to a person, to wit, while working as a correction
officer in the New York City Department of Correction assigned to
Rikers Island in the Bronx, New York, COLL willfully kicked Ronald
Spear multiple times in the head while he was restrained, which
resulted in injury to Spear, who died following COLL's assault.

          (Title 18, United States Code, Sections 242 and 2.)

-1-

COUNT TWO
(Conspiracy to Obstruct Justice - COLL & TAYLOR)

2.    From at least on or about December 19, 2012, up to
and including in or about April 2015, in the Southern District of
New York and elsewhere, BRIAN COLL and BYRON TAYLOR, the defendants,
and others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
violate Title 18, United States Code, Section 1512(b)(3).

3.    It was a part and an object of the conspiracy that
BRIAN COLL and BYRON TAYLOR, the defendants, and others known and
unknown, would and did knowingly use intimidation, threaten, and
corruptly persuade another person, and engage in misleading conduct
toward another person, with intent to hinder, delay, and prevent the
communication to a law enforcement officer of the United States of
information relating to the commission or possible commission of a
federal offense, to wit, COLL, TAYLOR and their co-conspirators
agreed to make false statements to multiple investigators about the
assault of Ronald Spear, an inmate at a Rikers Island correctional
facility, in order to cover up the fact that COLL had unlawfully
assaulted Spear by repeatedly kicking Spear in the head after Spear
had been restrained.

(Title 18, United States Code, Sections 1512(b)(3) & (k).)

COUNT THREE
(Obstruction of Justice - COLL)

4.    On or about December 19, 2012, up to and including
in or about 2015, in the Southern District of New York and elsewhere,
BRIAN COLL, the defendant, knowingly used intimidation, threatened,
and corruptly persuaded another person, and attempted to do so, and
engaged in misleading conduct toward another person, with intent to
hinder, delay, and prevent the communication to a law enforcement
officer of the United States of information relating to the
commission or possible commission of a federal offense, and aided
and abetted such conduct, to wit, COLL himself made, and encouraged
others to make, false statements to New York Department of Correction
senior staff and the Bronx District Attorney's Office with respect
to the death of Ronald Spear, an inmate at Rikers Island, in violation
of Title 18, United States Code, Sections 1512(b)(3).

(Title 18, United States Code, Sections 1512(b)(3)and 2.)

-2-

COUNT FOUR
(Conspiracy to File False Forms - COLL & TAYLOR)

5.    From on or about December 19, 2012, through in or about at least March 2015, in the Southern District of New York and elsewhere, BRIAN COLL and BYRON TAYLOR, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, the filing of false forms, in violation of Title 18, United States Code, Section 1519.

6.    It was a part and an object of the conspiracy that COLL and TAYLOR, the defendants, and others known and unknown, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, COLL, TAYLOR and their co-conspirators agreed to falsify use of force reports with the intent to impede the investigation of the death of Ronald Spear, an inmate at Rikers Island, which investigation falls within the jurisdiction of the United States Attorney's Office for the Southern District of New York, in violation of Title 18, United States Code, Section 1519.

(Title 18, United States Code, Section 371.)

Count Five
(Filing False Report - COLL)

7.    From on or about December 19, 2012, through in or about at least February 2, 2013, BRIAN COLL, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, BRIAN COLL falsified use of force reports with the intent to impede the investigation of the death of Ronald Spear, an inmate at Rikers Island, which investigation falls within the jurisdiction of the United States Attorney's Office for the Southern District of New York.

(Title 18, United States Code, Sections 1519 and 2.)

COUNT SIX
(Obstruction of Justice by Lying in a Federal Grand Jury - TAYLOR)

8.   On or about April 9, 2015, in the Southern District
of New York, BYRON TAYLOR, the defendant, corruptly influenced,
obstructed, and impeded, and endeavored to influence, obstruct, and
impede, the due administration of justice, to wit, BYRON TAYLOR
provided false and misleading testimony to a grand jury sitting in
the Southern District of New York regarding the use of force incident
leading to the death of Ronald Spear, including providing false
testimony about his role in the use of force incident and the specific
location where the use of force incident occurred.

(Title 18, United States Code, Section 1503(a).)

The bases for my knowledge and for the foregoing charge are,
in part, as follows:

9.   I am a Special Agent with the FBI and have been
employed by the FBI since August 2005.   I have participated in the
investigation of this matter, which has been conducted jointly by
the Federal Bureau of Investigation and Criminal Investigators in
the U.S. Attorney's Office.   I am familiar with the information
contained in this affidavit based on my own personal participation
in the investigation, my review of documents and recordings, and
conversations that I have had with other law enforcement agents and
other individuals.   Because this affidavit is being submitted for
the limited purpose of establishing probable cause, it does not
include all the facts that I have learned during the course of my
investigation.   Where the contents of documents, and the actions and
statements of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

## Overview

10.   Based on the sources described herein, there is
probable cause to believe that on or about December 19, 2012, Ronald
Spear, a pre-trial detainee at Rikers Island, was assaulted by then
Correction Officer BRIAN COLL, the defendant, while Spear was fully
restrained by correction officers including defendant BYRON TAYLOR
and posed no danger to COLL or any other correction officers.
Specifically, COLL repeatedly kicked Spear in the head while Spear
was already restrained and while he was lying face-down, prone on
the prison floor. COLL continued to kick Spear in the head even after
another correction officer told to COLL to stop and attempted to

-4-

shield Spear's head from further blows.  After COLL kicked Spear in the head multiple times, COLL bent down and picked up Spear's head. COLL put his face inches away from Spear, and stated words to the effect of "that's what you get for fucking with me," and "remember that I'm the one who did this to you."  COLL then dropped Spear's head, and it struck the hard prison floor.  As a result of this assault, Spear suffered severe bodily injuries, including multiple contusions to the skull, and died.

11.   Additionally, based on the sources described herein, there is probable cause to believe that, immediately following the assault and death of Spear, the correction officers who were involved in or witnessed the use of force, including BRIAN COLL and BYRON TAYLOR, the defendants, conspired with each other and with others to cover up the assault so that it would appear that the use of force against Spear was warranted, and that the death resulting was accidental or could be blamed on the victim himself.   In particular, COLL and his conspirators agreed to falsely report that Spear had attacked COLL with a cane and lie about the fact that COLL had repeatedly kicked Spear in the head while he was restrained. They also agreed, at the request of defendant BYRON TAYLOR, to omit the fact that TAYLOR was involved in the incident in their use of force reports and statements about the offense.   Accordingly, TAYLOR did not fill out a use of force report, and neither COLL nor the other officers reported that TAYLOR was present for the assault on Spear. Rather, COLL, TAYLOR and their co-conspirators repeatedly lied about the assault as agreed, including in official use of force reports that union representatives stressed had to be "consistent."  They continued their lies in statements to Department of Correction staff and investigators, state and federal prosecutors, and before state and federal grand juries.

## Background

12.   Based on my training and experience, and my review of documents, including records provided by New York City Department of Correction ("NYCDOC"), including the file maintained by NYCDOC in connection with the death of Ronald Spear, as well as my review of the New York City Police Department ("NYPD") investigation into the death of Spear, and of interviews of individuals employed by NYCDOC, including the NYCDOC Investigative Division ("ID") investigators, correction officers and contract medical employees, and my review of pictures of Dorm 2 in the North Infirmary Command on Rikers Island, I have learned the following about the central locations and individuals involved in the assault of Spear:

## The Scene of the Assault

a.    Rikers Island is a jail complex, located in the Bronx, New York, and maintained by the NYCDOC.

b.    The North Infirmary Command ("NIC") is a facility on Rikers Island that houses inmates who have serious and/or chronic medical needs and/or physical limitations.   It is separated into multiple dorm areas, including but not limited to Dorm 2, which is separated into Dorms 2A and 2B.   In December 2012, Dorm 2A was shut down for structural renovations, and thus only Dorm 2B housed inmates at that time. There are no cameras located in Dorm 2.

c.    Dorm 2B contains open beds capable of housing approximately 25 to 26 inmates.   The beds make up the primary area of the dorm, with a distance of approximately 20 feet between the last row of beds and the main exit from the dorm. There are a total of two exits from Dorm 2B.   One door leads to a treatment room (the "treatment room"), which is also connected to the doctor's office. The main exit door leads into a hallway (the "interior hallway"). The L-shaped interior hallway connects Dorms 2A and 2B, then turns 90 degrees to the door that leads to the main NIC hallway (the "exterior hallway").   Windows from the treatment room look out into the interior hallway. On the right side of the interior hallway (when facing outwards from Dorm 2B) is what is referred to as the "A-Post," or the "bubble."   A diagram of this area is attached to the Complaint as Exhibit A and incorporated herein by reference.

d.    The "bubble" is the control center for the Dorm 2 area, and is a large office area that is manned at all times by a correction officer referred to as the "A-Post" Officer.   The bubble is lined with large windows with views into the interior hallway, as well as a window with a view into Dorm 2B.   The door leading from Dorm 2B into the interior hallway also has a large window, so that anyone standing in front of the door will have a clear view of the stretch of the interior hallway between Dorms 2A and 2B.

e.    The controls that unlock the doors leading from the housing areas in Dorm 2 into the interior hallway are located in the bubble, as are the controls that unlock the door leading from the interior hallway to the exterior hallway.  Accordingly, an individual looking to enter or leave Dorm 2B needs to be allowed (or "buzzed") in by the controls in the bubble, which are typically manned by the A-Post Officer.

### The Victim

f.    Beginning in or about September 2012, through on or about December 19, 2012, Ronald Spear was a pre-trial detainee housed in Dorm 2B.  Spear was placed in the NIC because, among other afflictions, he suffered from end-stage renal disease and required regular dialysis.  While housed in NIC, Spear wore glasses, a bracelet indicating that he was a "Risk of Fall," and typically walked with a cane.  In connection with his dialysis, medical records reflect that Spear would sometimes be treated at the clinic at Rikers, but was also sometimes taken to outside medical facilities for care.

### The Defendants and Other Relevant Correction Officers

g.    BRIAN COLL, the defendant, joined NYCDOC in 2002. On December 18 to December 19, 2012, COLL was working his regular post in NIC Dorm 2.  Specifically, he was assigned to the "A-Post" which means that he was responsible for manning the control center, or the bubble.  On December 18 to December 19, 2012, COLL worked from 11 pm to 7 am.  COLL remained stationed as the A-Post Officer on that shift.

h.    A correction officer who has provided information and testimony to the Government pursuant to a grant of use immunity ("CW-1") was assigned as the floor officer in the Dorm 2B housing unit on December 18 to 19, 2012 as mandatory overtime. CW-1 was required to work the shift beginning at 11 pm on December 18 and continuing to approximately 7 am on December 19, 2012.  As the floor officer, CW-1 was responsible for overseeing the safety and security of the inmates housed in Dorm 2B and stayed in the Dorm with the inmates during this shift.

i.    A second correction officer who is cooperating with the investigation ("CW-2")[1] was assigned to monitor a particular inmate on suicide watch in Dorm 2B on December 18 to December 19, 2012, beginning at 11 pm on December 18 and continuing to 7 am on December 19, 2012.  With the exception of meal breaks, CW-2 — like CW-1 — remained in the dorm with the inmates during this shift.

j.    BYRON TAYLOR, the defendant, joined NYCDOC in April of 2012.  On December 18, 2012, TAYLOR was working on the 3 pm to 11 pm shift on Rikers Island, but not in Dorm 2.  During his shift, TAYLOR learned that he would be working overtime, and staying for the 11 pm to 7 am shift. TAYLOR in fact worked the overtime shift, from December 18 to December 19, 2012.  For his second shift, TAYLOR worked as the meal replacement officer in the NIC, which meant that he would relieve other correction officers when they took their breaks.  Log books from December 19, 2012, indicate that, in connection with this role, TAYLOR relieved the Dorm 2 officers, including BRIAN COLL, the defendant, and CW-1 and CW-2 during their breaks in the early morning hours of December 19, 2012.  At other times during this shift, as described below, he slept in the bubble.

---

[1] CW-2 has pled guilty in federal court to conspiring to commit obstruction of justice and filing a false report in connection with the death of Ronald Spear pursuant to a cooperation agreement.  CW-2 is cooperating with the Government in the hopes of obtaining leniency at sentencing. CW-2 has thus far provided reliable and credible information that has been corroborated.

The Assault and Death of Ronald Spear

13.   Based on my interviews of CW-1 and CW-2, I have
learned the following, in substance and in part, with respect to the
assault by BRIAN COLL, the defendant, of Ronald Spear, in the early
morning hours of December 19, 2012, while he was being restrained
by CW-2 and BYRON TAYLOR, the defendant:

a.   CW-1 understood that Ronald Spear was seriously
ill with kidney disease, and was known to complain to medical staff,
correction officers, inmates and others about the lack of adequate
medical care at Rikers Island and Spear's desire to receive dialysis
outside of Rikers Island, among other things.

b.   During the early morning hours of December 19,
2012, while CW-1 and CW-2 were on duty, Ronald Spear and COLL, the
defendant, got into a verbal altercation.  According to CW-1 and
inmates housed in Dorm 2B that night, during this altercation, both
COLL and Spear each yelled profanities at the other.  This verbal
altercation came about because Spear was demanding to see the doctor.

c.   Further, according to CW-1, after the verbal
altercation occurred during the early morning hours of December 19,
2012, while CW-1 was walking past the bubble during his/her break,
COLL said to CW-1, in sum and substance, and in part, that Spear was
"an asshole."

d.   On or about December 19, 2012, at approximately
5 am, Ronald Spear walked out of Dorm 2B to the hallway outside the
"bubble" in an attempt to get to the doctor's office.  Spear was
stopped in the hallway by COLL.  Through interviews of the doctor
who was on duty that morning, I have learned that COLL stuck his head
in the doctor's office doorway, and asked whether the doctor on staff
could see Spear. The doctor responded that he could see Spear later
in the morning, but not right then, and waved to Spear, who was
standing in the hallway.

e.   Following the doctor's postponement of seeing
Spear, a verbal altercation between COLL and Spear ensued.  CW-1 and
CW-2, both of whom were working in the housing area of Dorm 2B, heard
the commotion in the interior hallway, and ran to the door of Dorm
2B, which had a large window with a view into the hallway where COLL
and Spear were standing.  According to CW-2, COLL and Spear began
jabbing at each other, with COLL then punching Spear in the face.
CW-2 started to push on the locked door to try and force it open with

-9-

his/her body weight because COLL, who was involved in the altercation, could not buzz CW-2 into the hallway.

        f.    While standing at the door of Dorm 2B, CW-1 observed COLL and Ronald Spear yelling at each other.  He/she then saw COLL punch Ronald Spear in the face and in the body.  During the altercation, CW-1 observed Spear raise his hand above his head, although CW-1 never saw Spear make contact with COLL.

        g.    As CW-1 was watching the altercation unfold in the hallway, CW-2 was trying to force open the door from the housing unit to the interior hallway.  At some point, while CW-2 was attempting to open the door, it unlocked, and CW-2 was able to enter the hallway.  CW-2 entered the hallway, immediately throwing his/her arms around Spear in an attempt to physically restrain him.  According to both CW-1 and CW-2, CW-2 almost immediately brought Spear to the floor while COLL watched.

        h.    According to CW-1, moments after CW-2 entered the hallway, TAYLOR appeared in the interior hallway.  CW-1 recalls seeing TAYLOR approach the area where CW-2 and Spear were located on the floor in the interior hallway.  CW-1 then saw TAYLOR bend or kneel down next to the top half of Spear's body.  TAYLOR put his hands on the inmate, in what appeared to be an effort to assist CW-2 in restraining the inmate.  The whole time this was happening, CW-1 observed that COLL was standing by Spear's head.

        i.    According to CW-1, after CW-1 witnessed CW-2 bring Ronald Spear to the floor and saw TAYLOR enter the scene and kneel down next to the inmate to help restrain him, CW-1 turned back to the inmates in the dorm and moved away from the door.  He/she told the inmates — who were becoming agitated and had begun yelling things along the lines of "what are they doing to him?" and "they're going to kill him!" — to go back to their respective beds.  CW-1 stated that some of the inmates were kneeling and/or standing on their beds to get a view of what was going on in the hallway.

        j.    CW-1 turned back around to see what was happening in the hallway.  Because CW-1 was standing further away from the door, he/she no longer had a view of CW-2 or the inmate, nor could he/she see TAYLOR, all of whom CW-1 assumed were still on the ground.  CW-1 stated that he/she witnessed COLL's upper body move back and forth in a motion consistent with kicking.  While this was happening, the inmates in the housing area continued to shout things along the lines of "they're kicking him!" and "they're killing him!"

k.      According to CW-2, after CW-2 brought Spear to
the floor, CW-2 was able to secure Spear's left hand behind Spear's
back.   Spear initially continued to struggle, and CW-2 repeatedly
told him to stop resisting, while CW-2 attempted to secure Spear's
second hand.   After a few minutes, CW-2 was able to secure Spear's
second hand behind his back.   CW-2 recalls that after Spear was
brought to the ground, COLL was in front of Spear (by his head) and
did not attempt to help CW-2 restrain Spear.

l.      Almost immediately after this occurred — and
while CW-2 had both of Spear's hands secured behind his back and was
physically on top of Spear — COLL became irate, stood up and yelled
"motherfucker!," and reared his foot back.   COLL proceeded to kick
Spear in the head, and pulled his foot back to do it again.

m.      Upon realizing what was happening, CW-2
exclaimed "No!" or "Don't!" and reached out with his/her right hand
to try to prevent COLL from making contact with Spear's head again.
As a result, COLL kicked CW-2, injuring CW-2's right wrist.
Undeterred, COLL kicked Spear one or two more times in the head.

n.      After COLL stopped kicking Spear in the head,
Spear lay on the floor, moaning in pain.   COLL kneeled down and picked
up Spear's head and held Spear's face close to his.   COLL then said
to Spear, in sum and substance, "that's what you get for fucking with
me," and "remember that I'm the one who did this to you."   COLL then
dropped Spear's head, which struck the hard prison floor.

o.      According to CW-2, the NIC Probe Team, a team
that typically responds to use of force incidents and other prison
emergencies (the "Probe Team"), responded moments later.   CW-2
looked up and saw, among other prison staff, TAYLOR standing in the
hallway.

p.      A Captain who had arrived with the Probe Team
(the "Probe Team Captain") handed CW-2 his handcuffs, which CW-2
placed on Spear's wrists.   Shortly thereafter, CW-2 noticed that
Spear seemed to have stopped breathing.   CW-2 immediately told this
to the Probe Team and others standing in the area.   The Probe Team
Captain asked CW-2 and others to try to get Spear to his feet.   CW-2
and others attempted to lift Spear, but he remained non-responsive.
The Probe Team Captain summoned medical staff to the scene.

q.      The Rikers Island contract medical staff and
responding emergency medical technicians (the "EMTs") attempted to

-11-

resuscitate Spear.  After multiple attempts by the in-house medical
staff and the EMTs to resuscitate Spear, he was pronounced dead.

14.   Based on my review of documents maintained by the
Office of the Chief Medical Examiner for the City of New York (the
"Medical Examiner"), my review of correspondence regarding an
autopsy of Spear performed by the Medical Examiner, my conversation
with the law enforcement officers that interviewed the individual
who performed the autopsy of SPEAR, as well as my review of notes
and memos reflecting that interview, I have learned the following
about the cause of Spear's injuries and death, which is consistent
with statements by CW-1 and CW-2 described above:

a.   Spear's autopsy was conducted at the Bronx
Office of the Chief Medical Examiner.

b.   The autopsy revealed that Ronald Spear had three
recent contusions on his head. At least two of those contusions were
what the Medical Examiner described as "above the hat line," and were
thus inconsistent with being sustained as part of a fall.  One of
the contusions involved what the Medical Examiner described as a
"brain bleed" caused by the blunt force of the impact.

c.   The Medical Examiner also found that Spear had
fractures of his left third through sixth ribs, but could not
conclusively state whether or not these fractures were caused by CPR.
Spear had bruising over his right rib cage, his elbow, his wrist,
his hip and his left leg.

d.   Spear's cause of death was determined to be
hypertensive cardiovascular disease, with "physical altercation
including blunt force trauma to head" and diabetes mellitus as
contributing factors.

e.   The Medical Examiner confirmed that the
placement of Spear's head injuries was consistent with Spear being
kicked in the head while he was lying prone on the ground.

15.   During the course of the investigation, I and other
law enforcement agents have participated in interviews of inmates
who were housed in the NIC, Dorm 2B, on or about December 18 and 19,
2012.  Based on my participation in those interviews, I have learned
the following:

a.   An inmate ("Inmate-1") recalls that Ronald
Spear was a good friend to him, and that Spear was outgoing and

friendly.  He also recalled that Spear would often get into verbal altercations with BRIAN COLL, the defendant.

b.   Inmate-1 described Spear as "sickly," and as needing dialysis.  He recalls that at or about the time of the assault, Spear had not had dialysis for a while, because he preferred to go to an outside hospital, but the correction officers preferred him to have the dialysis done at Rikers.

c.   Inmate-1 recalls that, a couple of days prior to the assault, he witnessed Spear and BRIAN COLL, the defendant, get into a verbal argument in which Spear yelled profanities at COLL and COLL threatened Spear.

d.   Inmate-1 recalls that on the morning Spear died, he saw Spear, BRIAN COLL, the defendant, and a "tall, white C.O." (the "Tall C.O.")[2] in the interior hallway outside Dorm 2B.   Inmate-1 remembers the Tall C.O. grabbing Spear from behind and a black, bald correction officer (the "Bald C.O.")[3] coming from the direction of the bubble to help wrestle Spear to the ground.   Inmate-1 recalls the Tall C.O. and the Bald C.O. restraining Spear as COLL kicked Spear in the head and the chest.

16.   During the course of the investigation, law enforcement agents interviewed contract medical staff who were working in the NIC Dorm 2B, on or about December 18 and 19, 2012. Based on my conversations with the law enforcement officers that participated in those interviews, and my review of notes and memos of those interviews, I have learned the following:

a.   A nurse ("Nurse-1") was working in Dorm 2 of the NIC on the morning of December 19, 2012. Nurse-1 recalls that, while Nurse-1 was in the nurse's station, Nurse-1 became aware of an altercation in the hallway.

b.   Nurse-1 went to the Treatment Room door and stood with one or more inmates who were looking out the window. Nurse-1 recalls that Spear was on the ground and that there was a bald, black correction officer kneeling next to Spear and attempting to get Spear's arms behind his back.   Nurse-1 recalls that BRIAN

---

[2] This description is consistent with a description of CW-2, who is a tall, light-skinned, and Hispanic.

[3] This description is consistent with a description of BYRON TAYLOR, the defendant, who is bald and African American.

COLL, the defendant, was present, as was a fair-skinned white or Hispanic correction officer.

17.   Based on my review of records from the outside hospital to which BRIAN COLL, the defendant, CW-1 and CW-2 were taken on or about December 19, 2012, I have learned that CW-2 was examined in connection with pain in his/her right wrist and forearm.   The medical records show that there was a clinical indication for a possible fracture and his/her wrist was x-rayed.   The x-ray revealed no acute fracture.

### The Cover-Up

18.   Based on interviews of CW-1 and CW-2, and my review of documents from NYCDOC and other sources, I know that, almost immediately following the assault of Ronald Spear, BRIAN COLL and BYRON TAYLOR, the defendants, along with CW-1 and CW-2 and others, arranged to and did cover up the circumstances leading to the death of Ronald Spear.   In particular:

#### False Statements by COLL Immediately After Assault

a.   After the Probe Team and Assistant Deputy Wardens (the "ADWs") arrived on the scene, COLL told the Probe Team Captain and the ADWs that Spear had swung a cane at COLL and hit COLL in his stomach and, in response, COLL and CW-2 had brought the inmate to the floor and restrained him.   One of the ADWs asked CW-2 if this was what happened and, as COLL looked on, CW-2 agreed that it was, even though CW-2 knew that was not actually what had happened because, among other things, Spear had never swung a cane at COLL.   CW-2 at no point mentioned the fact that COLL had kicked Spear multiple times in the head.

b.   After the medical team arrived, and were unable to resuscitate Spear, CW-1, CW-2 and COLL sat together in the housing area.   According to CW-1, while they were sitting in the housing area, BYRON TAYLOR, the defendant, came into the area and asked BRIAN COLL, the defendant, CW-1, and CW-2, in sum and substance, to leave him off the reports, stating repeatedly (and falsely) "I wasn't here."   COLL and CW-1 agreed to leave him out of the reports.   CW-1 does not recall CW-2, who appeared to be in shock, responding.

c.   Shortly thereafter, representatives from the Correction Officers' Benevolent Association (the "Union") met with CW-1, CW-2, and COLL and escorted all three of them to a clinic on Rikers Island.   According to CW-2, the representatives from the

Union stressed the importance of all of the correction officers "being consistent" on their use of force reports.

d.      After being treated at the in-house clinic, BRIAN COLL, the defendant, CW-1, and CW-2 were taken to an outside hospital where they were treated. According to both CW-1 and CW-2, representatives from the Union stayed with them while they were at the hospital.

e.      According to CW-1 and CW-2, while at the hospital, a lawyer for the Union arrived.  CW-2 recalls that the lawyer, while appearing to be reading from a document of some kind, repeated to COLL and CW-2 the story that COLL had told earlier about Spear attacking COLL with the cane and the joint effort to restrain Spear.   The lawyer then asked COLL if that was in fact what had happened; COLL responded it was.   The lawyer then turned to CW-2 and asked if CW-2 agreed; CW-2 expressed his/her agreement, even though CW-2 knew at the time that it was an inaccurate statement of what happened, and did not include the fact that COLL had kicked Spear multiple times in the head.   CW-1 recalls the lawyer stressing the importance of the officers "being consistent" in their respective use of force reports.

f.      Following their treatment at the outside hospital, CW-1, CW-2, BRIAN COLL, the defendant, and the Union representatives left the hospital and went to a pizza parlor to have dinner, where COLL continued to talk to the Union representatives. Following dinner, they returned to Rikers Island.   According to CW-1, during the transport back to Rikers, BRIAN COLL, the defendant, referred to Ronald Spear, in sum and substance, and in part, as an "asshole."   At the time he made these comments, COLL knew that Spear had died.

### The False Use of Force Reports

19.   I know from my review of the NYCDOC policies that all correction officers involved in or witness to a use of force in which any force is used to restrain or otherwise contain an inmate or anyone else must file a report, referred to as a use of force report.   In connection with the death of Ronald Spear, I know from my review of NYCDOC documents that 9 officers filed use of force reports, including BRIAN COLL, the defendant, CW-1 and CW-2.   No report was filed by BYRON TAYLOR, the defendant, although, as described herein, he was involved in the use of force.

20.   Based on interviews of CW-1 and CW-2, and my review

-15-

of documents from NYCDOC and other sources, I know that BRIAN COLL and BYRON TAYLOR, the defendants, along with CW-1 and CW-2 and others, agreed to create false records that would ultimately be submitted to NYCDOC ID investigators. Specifically, I have learned the following:

a.     According to CW-1 and CW-2, after returning to Rikers Island, they, along with BRIAN COLL, the defendant, were placed in the cafeteria where they were provided with blank use of force reports by another Captain ("Captain-2"), and again told to be consistent.  Specifically, CW-1 recalls that Captain-2 stated, in sum and substance, and in part, that if they "were not consistent, there were going to be issues."

b.     According to CW-2, BRIAN COLL, the defendant, began to state, out loud and in detail, what he was writing in his report, including the false story that Spear had attacked him with a cane.   CW-2 understood this at the time to be COLL dictating what CW-2 should write in his report.     CW-2 followed the implicit instruction, even though CW-2 knew at the time that what CW-2 was writing was not true, that it did not accurately depict what had happened, and that it completely omitted the fact that COLL had kicked Spear in the head multiple times.   CW-2 turned in a use of force report that largely tracked the events as COLL dictated them, including the story about the cane that CW-2 knew to be untrue.   CW-2 also did not list BYRON TAYLOR, the defendant, as present for the use of force incident. CW-2 recalls that, with the exception of briefly leaving the room once, a representative from the Union was present the entire time the officers filled out their use of force reports.

c.     Meanwhile, CW-1 made efforts to be vague in CW-1's report and stated simply, in sum and substance, and in part, that CW-1 witnessed an altercation between BRIAN COLL, the defendant and Ronald Spear.   When CW-1 attempted to turn this report in to Captain-2, Captain-2 told CW-1 to re-do it to make it consistent with the others.

d.     CW-1 then waited for Captain-2 to leave the room (CW-1 does not recall whether the Union representative was still present), and worked with CW-2 and COLL to write reports that did not mention the presence of BYRON TAYLOR, the defendant, at the incident, as they had agreed, and as TAYLOR had requested.   CW-1 then added a statement about observing Spear leave the housing area with a cane, among other things, and turned in his/her report.   This time, it was accepted.

-16-

21.    I participated in the interview of Captain-2, and based on that interview, I have learned the following:

a.    In his role as a supervisor, Captain-2 has overseen, on numerous occasions, the drafting and collection of use of force reports.   In his experience, a Union representative is always present while the reports are being drafted, and it is his understanding that it is the Union representative's responsibility to review the reports before they are finalized to ensure that they are consistent.   Captain-2 further stated that, to the extent correction officers create multiple drafts of hand-written reports, the officers typically shred or destroy the earlier drafts.

b.    On or about December 19, 2012, Captain-2 brought multiple blank use of force reports to the area where BRIAN COLL, the defendant, CW-1 and CW-2 were waiting to write their reports. He handed each of them multiple blank copies, and believes that at least one of the correction officers created more than one draft of the report.   Captain-2 recalls that a Union representative was present in the room with the officers.

c.    In the weeks and months that followed Ronald Spear's death, Captain-2 received numerous phone calls from BRIAN COLL, the defendant.   During these calls, COLL would typically ask Captain-2 if Captain-2 knew anything about the investigation of the use of force or any allegations that were being made against COLL.

d.    In one of these calls, which happened approximately six to eight months after Ronald Spear died, Captain-2 received a phone call from BRIAN COLL, the defendant, in which COLL asked Captain-2 in sum and substance whether he, COLL, should get a tattoo of a teardrop on his eyelid.   Captain-2 responded that he did not know what COLL was talking about.   Coll responded, in sum and substance, "You know, when you get a body…"   I know from my training and experience as an investigator that a tattoo of a teardrop on the eyelid is symbolic in a criminal street gang that the gang member has killed someone.

e.    In a subsequent call, COLL told Captain-2 in sum and substance that the "state court case" had ended, and said something to the effect of "I beat the case."   COLL said that it had taken a long time to do so.   Captain-2 tried to end the call quickly.

-17-

22. I have reviewed the use of force reports filed by BRIAN COLL, the defendant, CW-1 and CW-2. Consistent with the statements by CW-1 and CW-2 described above, the use of force reports falsely describe in consistent fashion the incident leading to the death of RONALD SPEARS. In particular:

a. The use of force report written by BRIAN COLL, the defendant, states that the physical confrontation began when Spear "struck [Coll] in the stomach area with his cane," and then "raised the cane above his head to strike this writer and said 'I'm going to knock your fucking head off CO.'" COLL states in the report that he then punched Spear twice in the stomach:

> "to stop said inmates [sic] aggression but that
> did not slow said inmate down.  Said inmate did
> not drop his cane and advanced toward this
> writer prompting this officer to strike said
> inmate two to three more times in the facial area
> to stop his aggression.  It was then that [CW-2]
> came through the door to give his assistance and
> [CW-2] proceeded to apply an upper body control
> to inmates torso area.  This writer grabbed
> inmates legs and this writer and [CW-2] guided
> said inmate to the floor.  This writer
> restrained inmates legs while [CW-2] pulled
> said inmates arm out from his side placing
> inmates wrists together behind his back."

COLL's report fails to include defendant BYRON TAYLOR's role in the incident, as the conspirators had agreed, and omits any reference to COLL repeatedly kicking Spear in the head while he was restrained.

b. CW-2's use of force report, which CW-2 acknowledges is false and misleading, is "consistent" with COLL'S false report, as the conspirators had agreed.  In particular, CW-2's use of force report (i) falsely states Spear attacked COLL with a cane, (ii) does not report that COLL kicked Spear in the head or lifted and then dropped his head to the floor and (iii) does not make any mention of TAYLOR.

c. CW-1's use of force report, which CW-1 acknowledges is false and misleading, is likewise "consistent" with COLL's false report, as the conspirators had agreed.  CW-1's report omits any reference to TAYLOR, and does not include the fact that

-18-

CW-1 observed COLL make swinging motions with his upper body consistent with kicking Spear.

          d.   On or about January 31, 2013, and February 2, 2013, CW-2 and BRIAN COLL, the defendant, respectively, wrote, as part of their employment responsibilities, addendum use of force reports.  Specifically, both were asked to submit a report confirming that they were the only two correction officers involved in the use of force incident with Ronald Spear on December 19, 2012. Consistent with the agreement to leave BYRON TAYLOR, the defendant, out of the use of force reports, COLL and CW-2 submitted the addendum reports confirming that they were the only two officers involved.

<u>Planting Evidence to Support the False Story</u>

          23.   Based on my review of evidence logs provided by NYCDOC ID, I know that a standard issue cane was vouchered at the crime scene at or around 11 am on December 19, 2012.  The cane is identified as a "DOC issued brown cane allegedly Spear's."  Based on my conversation with the law enforcement officers who interviewed the NYCDOC ID investigator who vouchered the cane, as well as my review of notes and memos reflecting those interviews, I have learned that the investigator included the word "allegedly" because he believed that the circumstances that led to the recovery of the cane, approximately 5 hours after Ronald Spear had been pronounced dead and the scene had been previously searched with no cane recovered, were suspicious.

          24.   Based on my conversation with the law enforcement officers who participated in the interviews of NYCDOC ID investigators and a correction officer ("CO-1") who was working in the intake area of NIC beginning at or around 7 am on December, 19, 2012, as well as my review of notes and memos reflecting those interviews, I have learned the following with respect to how a cane "allegedly" used in the incident was vouchered as evidence:

          a.   Canes are commonly stored in the intake area because it is the area from which inmates enter or leave the prison.

          b.   Sometime around 10 am on December 19, 2012, while CO-1 was working in the intake area in the NIC, he received a call from a captain ("Captain-3") asking him to bring a cane to Dorm 2B.  Captain-3 did not ask CO-1 to bring a specific cane, nor did he explain why the cane was needed.  CO-1 selected one of the numerous largely identical canes from the intake area and brought it to Dorm 2B, which had been taped off as a crime scene.

        c.     When CO-1 arrived at Dorm 2B, he found
Captain-3, and Captain-3 told CO-1 to hand the cane over to the ID
investigator.  Captain-3 thanked CO-1 for bringing the cane.

        d.     The NYCDOC ID investigator was told that the
cane belonged to Ronald Spear, and had been recovered from the crime
scene, although this was not in fact true.

### False Statements to the Bronx District Attorney's Office

        25.    I and other law enforcement officers have spoken
to witnesses, including CW-1 and CW-2, and an Assistant District
Attorney (the "ADA") from the Bronx District Attorney's Office (the
"Bronx DA's Office") and reviewed related documents concerning false
statements made to the Bronx DA's Office in a continuing effort to
cover up the circumstances leading to the death of Ronald Spear by
obstructing the criminal investigation.  In particular:

        a.     According to CW-1, he/she met on two separate
occasions with the Bronx DA's Office in connection with the Bronx
DA's investigation into the death of Ronald Spear, once in summer
of 2013, and again in or about October 2013.  CW-1 did not disclose
what CW-1 had witnessed on December 18 and 19, 2012, in either of
those meetings, and instead stuck with the story that the
conspirators had originally concocted.  During the first meeting,
CW-1 maintained the version of events that CW-1 had included in CW-1's
use of force report, and did not mention that CW-1 had seen BYRON
TAYLOR, the defendant, put hands on Spear, nor did CW-1 reveal that
CW-1 had seen BRIAN COLL, the defendant, make movements consistent
with kicking. During CW-1's second meeting with the Bronx DA's
Office, CW-1 declined to make any additional statements.

        b.     Following CW-1's second meeting with the ADA,
in or about October 2013, CW-1 received two calls from BRIAN COLL,
the defendant.  CW-1 had never received calls from COLL before.
During one of these calls, CW-1 recalls that COLL sounded as if he
had been drinking, and that COLL thanked CW-1 profusely, without
explicitly stating what he was thanking CW-1 for.  CW-1 understood
COLL to be thanking CW-1 for not saying anything to the Bronx DA's
Office about what had actually happened on December 18 and 19, 2012,
and instead sticking to the cover story COLL had crafted.  During
the second call, COLL attempted to talk to CW-1 about the incident.
On this call, COLL stated, in sum and substance, and in part, that
he could not believe that BYRON TAYLOR, the defendant, admitted that
he was present on the scene for the use of force, even though they

                              -20-

had agreed to not identify TAYLOR as being involved at TAYLOR's request.  CW-1 made efforts to end the call quickly.

c.    According to CW-2, he/she also met on two separate occasions with the Bronx DA's Office in connection with its investigation into the death of Ronald Spear, first in or about June 2013, and again in or about October 2013. A couple of days before CW-2 went in to meet with the Bronx DA's Office, BRIAN COLL, the defendant, called CW-2 and told CW-2 that he (COLL) had met with the Bronx DA's office.  Specifically, COLL told CW-2, in sum and substance, and in part, that he had "stuck with the story," and that it went well.  COLL asked CW-2, in sum and substance, and in part, to assure him that he/she would not deviate from the agreed upon story.  CW-2 agreed that CW-2 would not deviate.

d.    During CW-2's first meeting with the Bronx DA's Office, CW-2 did not truthfully disclose what CW-2 had witnessed on December 19, 2012.  Rather, during that first meeting, CW-2 maintained the version of events that CW-2 had included in CW-2's use of force report.

e.    Shortly after CW-2's first meeting with the Bronx DA's Office, CW-2 called BRIAN COLL, the defendant, and assured COLL that he/she "stuck to the story."  CW-2 also told COLL that, after CW-2 relayed the agreed-upon story, the ADA told CW-2, in sum and substance, and in part, that there was "no criminal wrongdoing here."  Based on COLL's response, CW-2 believes that COLL was both happy and relieved. COLL ended the call by thanking CW-2.

f.    During CW-2's second meeting, the Bronx DA's Office confronted CW-2 with the results of the autopsy conducted on Ronald Spear's body and asked directly if he/she had seen any kicking or anything else that would explain the blunt force trauma to Spear's head. CW-2 falsely stated that he/she did not.  CW-2 did not report back to COLL after this meeting.

26.    Based on interviews with NYCDOC ID Investigators, representatives of the Bronx DA's Office, and review of relevant documents, I know that state investigators and the ADA concluded that BYRON TAYLOR, the defendant, was in fact present during the use of force incident (notwithstanding the co-conspirators' decision to omit his name from the use of force reports).  In particular, I have learned that:

a.    Over a period of 14 months, state investigators and the Bronx ADAs interviewed multiple witnesses, including Nurse-1

and several inmates, including Inmate-1, who stated that a black, bald individual matching the description of BYRON TAYLOR, the defendant, was involved in the use of force incident, and, specifically, was involved in restraining Spear.

            b.    BYRON TAYLOR, the defendant, refused to meet with the Bronx DA's Office voluntarily, but responded to a grand jury subpoena.  Specifically, TAYLOR met with the ADA for the very first time on or about February 26, 2014, 14 months after Ronald Spear had died.  The next day, TAYLOR testified in the state grand jury, and while he finally admitted that he had in fact been present, TAYLOR stated that he was not involved in restraining Ronald Spear during the use of force incident that led to Spear's death.

### False Statement to NYCDOC ID Examiner

            27.    In or around March 2014, after the Bronx DA's Office had closed its investigation and the NYPD had ruled Ronald Spear's death a justifiable homicide, the NYCDOC investigators interviewed both BYRON TAYLOR and CW-2 about the death of Ronald Spear.  During these interviews, both TAYLOR and CW-2 maintained the co-conspirators' plans to concoct a false story about the events leading to Spear's death.  In particular:

            a.    On or about March 18, 2014, TAYLOR testified that he had been woken while sleeping in the bubble in the early morning of December 19, 2012 when he heard a loud banging on the plexi-glass windows of the bubble.  When he looked up, he saw COLL, CW-2, and Spear tussling in the hallway, with all three of them pushed up against the window.  TAYLOR stated that by the time he put his shoes on and left the bubble, Spear was already on the ground, and that Taylor played no role in restraining Spear.  TAYLOR stated that he instead ran out of the Dorm 2 area to the intake area of the prison to get help.  TAYLOR testified that he did not return to the dorm where the incident took place until at least an hour or so after the incident, when he was asked to relieve CW-1 and CW-2.  TAYLOR further testified he never kneeled down to talk to CW-2, never put hands on the inmate, and never saw any kicking.

            b.    On or about March 19, 2014, CW-2 also testified consistent with the cover-up. Specifically, CW-2 detailed for the investigators how Spear allegedly swung his cane at BRIAN COLL, the defendant, and falsely testified that he never saw COLL kick Spear in the head, even when he was confronted with medical evidence of blunt force trauma to Spear's head.

-22-

## Lies To Federal Grand Jury

28.   On or about April 9, 2015, BYRON TAYLOR, the defendant, appeared, pursuant to a federal subpoena, before a grand jury sitting in this district and provided sworn testimony. Specifically, TAYLOR testified to the following, in substance and in part:

a.   TAYLOR was asleep in the Dorm 2 bubble and was woken up by the sounds of the bodies hitting the plexi-glass windows. TAYLOR, who had not intended to fall asleep but who had taken off his boots, put his boots on and went out in the hallway.

b.   TAYLOR testified that, when he came out in the interior hallway, the inmate was on the ground being restrained by CW-2.   TAYLOR specified that the inmate was in the interior hallway, but not in the hallway adjacent to and visible from Dorm 2B with his feet possibly sticking out into the Dorm 2B adjacent hallway. TAYLOR stated that he bent down next to CW-2 to see if everything was ok, and then ran out to the intake area.   According to TAYLOR, he was only present in the interior hallway for a matter of seconds.

c.   TAYLOR testified that he was not involved in helping to restrain Ronald Spear, and at no point did he put hands on Spear, nor witness COLL kicking Spear.

d.   TAYLOR further testified that he was not in the hallway immediately adjacent to Dorm 2B, and that the use of force did not occur in that hallway, but actually occurred around the corner, on the other side of the bubble.   As a result, none of the purported inmate witnesses could have actually seen the use of force, and they were lying if they claimed to have seen the incident.   When confronted with crime scene photos showing that the body was in the Dorm 2B-adjacent hallway, visible to inmate witnesses, TAYLOR claimed that medical staff may have moved the body within the crime scene area after the death.

e.   TAYLOR also testified that he asked COLL, "Was I a part of this?" and COLL responded, "No, you weren't involved, don't worry about it.   You weren't involved, you are good."

f.   TAYLOR stated that he never told CW-1 or CW-2 not to disclose the fact that he was present for the use of force.

        WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of BRIAN COLL and BYRON TAYLOR, the defendants, and that each may be imprisoned, or bailed, as the case may be.

                        Special Agent Vanessa M. Tibbits
                        FBI

Sworn to before me this
9th day of June, 2015,

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT A



ILLUSTRATION ONLY – NOT TO SCALE